The next motion on calendar is Grubbs v. Brown. Good morning. Good morning. May it please the Court. I'm Colin West of White & Case. Together with the Legal Aid Society, we represent the appellants. The issue before the Court today is whether to issue a short, temporary stay of the district court's order authorizing the New York City Department of Correction to operate surveillance cameras in pre-arraignment attorney-client interview booths. The first thing I want to note before I address the merits and before I address irreparable harm is that the cameras are currently off and the city is apparently in no hurry to turn these cameras back on. Judge Daniels issued his decision lifting the injunction. He originally enjoined the use of the cameras entirely. He issued his decision lifting the injunction three months ago. The city has taken no steps to turn the cameras back on and, most recently, has agreed to voluntarily stay the use of the cameras pending the resolution of this motion. So your concern is just the presence of them? No, Your Honor. Our concern is if the court does not grant a stay, the city will turn the cameras on. On again. They will turn the cameras on again. But even if they're off, people will see them there and could be inhibited in exactly the same way that they would be inhibited if they were actually functioning. It is very much a concern of ours, the presence of the cameras, and we did ask Judge Daniels to order the removal of the cameras, both for the reasons Your Honor mentioned and as a remedy for the city's contempt of court. Can these cameras pick up visually interactions from which a lip reader could determine what is said? There is no evidence one way or the other, but you can see. Now, the city, with its revised proposal, has proposed to use masking technology that would supposedly obscure a small portion of the middle of the room and at least in theory, according to the city, would obscure the defendant's face. However, if the court reviews, I believe it's Exhibit 1 to the Popolo Declaration that's submitted in connection with this motion, which attaches an affidavit of a Department of Correction officer, there's a still photograph that shows the masked area as it's proposed to be used. And there's no expert testimony one way or the other, but just from a layperson looking at that small masked area, it certainly appears to me anyway that any slight movement of the criminal defendant's head would leave that aura, even if the person is just slightly taller than the person in the sample photograph, would allow the Department of Correction to see and record. Is the concern that the plaintiffs believe that the city will monitor these conversations and try to determine what people are saying, or is the concern more that they're inhibited from a full conversation? It's really both concerns. The first concern is we have had a history here, and it is a history of material misrepresentations to the court about the use of the cameras and a history of material violations of the district court's order. So we, counsel, frankly, the appellants representing these people, don't frankly trust the city's representations. Did those misrepresentations, as you call them, go to the question of whether the city, as it were, eavesdropped? Yes, yes, they did. Using sound? Not using sound. The misrepresentation goes to the question, I'm sorry, eavesdropping, to the extent that means sound, yes. But to the extent of surveilling in secret these attorney-client interviews, it absolutely did. And I think the key example and the best example is the city represented to the court, to Judge Daniels, when it was opposing the original injunction, that if they were allowed to use these cameras, that the DOC would monitor the cameras in real time only, and that no one would have access to the recordings absent a court order. Judge Daniels enjoined the use of the cameras, so the cameras weren't supposed to be on in the first place. We know that they were. And not only that, we know that in violation of the representation- Was that inadvertent, that they were left on, or was that done intentionally? The testimony from the city is that it was inadvertent. We simply, as the appellants and the plaintiffs and the criminal defendants, have no way of testing that assertion. But I will note that what was not inadvertent, and what I don't think can be described as inadvertent, is that eight separate Department of Correction officers logged in at a time when the cameras were supposed to be off and viewed recorded footage from one of these cameras. So in light of that, there are credibility issues that we have. Is it a legitimate concern that a lawyer might pass contraband? I don't think, frankly, that it is. And from what I understand, that the mesh partition between the- And I believe there's testimony on the record- Fine mesh partition. It's a fine mesh partition, and it allows the transaction of documents, the exchange of documents. But I don't believe that the city has even argued that this is about attorneys passing contraband. Is it about the safety of the lawyers? No. It's not about the safety of the lawyers at all. The lawyers are truly on the other side of a mesh partition. I see my time is up, if I may. You can finish. If I can finish. We believe that the policy here is to point a camera directly at the criminal defendant's face, effectively to say to that criminal defendant, we have the ability to monitor your entire attorney-client interview with sound and visually. You'll never know it if we do, but please go ahead and have a candid conversation with your attorneys. We believe that that is unnecessary in light of the district- Yes, the camera's removed. How can a criminal defendant, who might very well feel paranoid in that situation, be reassured at all? Well, we certainly have asked and will ask on appeal for the cameras to be removed, but we will note that, from what I understand, there is a light. One of the lines is that there is a light that comes on when the cameras are on, and our attorneys are at least able to advise the criminal defendant that the light is off, and that theoretically means that the camera is off. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Jonathan Popolo for appellees. There's no genuine dispute here that these cameras do not capture audio, so the conversations that the pretrial detainees have with their attorneys are not being audio recorded. What's the purpose of it? The purpose of it is to address security concerns. Is that contraband? That is one of many of the concerns, yes. Safety of the lawyer? Safety of the lawyer, safety of the . . . A lot of defendants don't necessarily like their lawyers. That's correct, Your Honor. I think that definitely could be one of the concerns. I think also the safety of the detainees themselves, because from other detainees and to have a record of what occurs in both the interview booth and the broader arraignment pen there . . . Doesn't the MeSH partition address contraband and safety of lawyers? In terms of lawyers, it probably does, Your Honor, I guess. I'm not . . . Is it a common area where there are multiple individuals in one area, or are they separated? It's a common area. It's an arraignment pen. The interview booths are located within an arraignment pen that can hold . . . I think the mail pen can hold up to about 25 detainees at a time. When were the cameras put in? The cameras, I believe when the new courthouse was built, they were put in then, so they were somewhere around 2015. What was done before new cameras were put in? In terms of . . . Well, in the old courthouse, which is what led to . . . was one of the issues that was at stake in the initial lawsuit, there were no private meeting areas. The lawyers had to communicate with their clients through the bars of the cell, in full view of the other detainees and guards, which is what the terms of the settlement that resolved the Sixth Amendment claim, among others, said that the Department of Correction had to create an interview booth that allowed private consultation. What I'm trying to get at is, was there a problem that the cameras were installed to address? Yeah, I think the . . . What was that problem? Speaking broadly, I think one of the issues that had to be addressed is, given the configuration of how this was built, and it was built by the state, not the city, there are certain visibility and sightline issues with respect to the arraignment pen and the interview booths that necessitate having the cameras in there. So the city had agreed to keep the cameras off for a while, and now it wants them back on during the pendency of the appeal? Correct. And why can't you just keep them off during the pendency of the appeal? Essentially because we put a lot of . . . How long have they been off? They have been off, well, except for the instances when they were inadvertently activated during the pendency of this, they have not yet been operational. Since when? Since they were constructed. Since the courthouse was constructed. Correct. They have not yet been operational. We made an application to be allowed to do this, and we're granted that application, and this has been the result of a years-long process that reflects the considered judgment of the DOC authorities of what they need for security purposes and management purposes, and it's been granted. And, I mean, we're not arguing that this is like an absolute emergency that they had to be turned on the next day or something like that, but we've waited a considerable period of time, and there could be another considerable period of time before we're allowed to implement the plan that has been approved. Can you identify any harm that's occurred as a result of the cameras not being turned on? The harm . . . Can you identify any harm that's occurred? There have thankfully not been . . . I think there have been some instances of contraband. There have not been any sort of violent incidences that . . . And this was addressed by Judge Daniels, though. It's sort of like you don't necessarily have to wait until you have the first one or a certain quantum of them beforehand. I mean, there's a legitimate concern about the effectiveness of security provisions in the absence of these cameras. Your adversary has described a large room, presumably long tables, a mesh, a bunch of lawyers on one side, a bunch of inmates on the other. Correct? I think . . . I'm not sure that's entirely accurate. Is each camera looking at one pair? Each camera is only . . . the cameras only record the detainee's side of the booth. There are three individual booths. And is it recording all of the detainees at once, or . . . The cameras in the booth, I think, are just covering what's in the booth. One booth. One booth at a time. Yeah, there are three booths, three cameras. Okay, so this large room is divided up into booths. Correct. It's an arraignment pen that has the booth . . . that has the detainee's side of the booth within the arraignment pen. The lawyers enter from another side through a vestibule, so they don't actually have to be physically present in the arraignment pen. Thank you. Thank you. Thank you both. We'll reserve decision. The motion in Arden-Rivera v. Sessions is taken on submission. And Secunder v. Sessions is taken on submission.